Patrick VASEY, Plaintiff–Appellant,

v.

MARTIN MARIETTA CORPORATION, a Maryland corporation, Defendant–Appellee.

No. 93–1062.

United States Court of Appeals, Tenth Circuit.

June 30, 1994.

Keith D. Lapuyade (Brice A. Tondre with him, on the brief), of Strate and Tondre, Wheat Ridge, CO, for plaintiff-appellant.

Katherine J. Peck (Susan B. Prose with her, on the brief), of Holme, Roberts and Owen, Denver, CO, for defendant-appellee.

Before LOGAN, McKAY, and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Plaintiff Patrick Vasey appeals from an adverse judgment entered in favor of Defendant Martin Marietta Corporation in his breach of contract and age discrimination action. We have jurisdiction pursuant to 28 U.S.C. § 1291.

Plaintiff was employed by Defendant from 1958 until he was laid off on April 12, 1991. From 1958 to 1985, Plaintiff worked in various positions within Defendant's Electronic Manufacturing Facility ("EMF"). In 1985, Defendant promoted Plaintiff to a Labor Grade 49 and transferred Plaintiff to the Intercontinental Ballistic Missile ("ICBM") Project placing Plaintiff in charge of tooling fabrication. Plaintiff worked at the ICBM project until the latter part of 1988 when he was transferred to Defendant's Titan missile program where Plaintiff served until his termination in 1991.

During Plaintiff's employment, Defendant issued a Code of Ethics and Standards of Conduct memorandum to all of its employees. Plaintiff received a copy, but testified that he paid little attention to its terms. Also during Plaintiff's employment, Defendant issued an equal opportunity memorandum to all of its employees setting forth Defendant's commitment to affirmative action and fighting discrimination in the workplace.

Beginning in 1988, Defendant engaged in massive cutbacks of personnel due to a sharp decrease in space exploration contracts with the federal government. In September of 1990, Gary Hinds, Director of EMF, informed Plaintiff that he had been selected for layoff. Hinds testified that Plaintiff was selected for layoff based on Plaintiff's 1990 "ranking" which ranked Plaintiff twentieth out of twenty-one employees in Labor Grade 49. This 1990 ranking was the result of a system utilized by Defendant to rank employees within their respective work groups. The rankings reflected the department supervisor's determination of the value of an employee's contributions to the company, relative to the employee's peers. In the event of a reduction in force, Defendant's lay-off policy directed management to take into account an employee's departmental ranking and to seek a transfer for the surplus employee if such a transfer would "serve to strengthen the organization." Following an unsuccessful attempt to transfer Plaintiff to the test area of EMF, Plaintiff was terminated on April 12, 1991. At the time of his layoff, Plaintiff was fifty-seven years old.

On October 31, 1991, Plaintiff sued Defendant alleging (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34, (2) breach of implied contract and express covenant of good faith and fair dealing, and (3) a claim based on promissory estoppel. At trial, the district court granted Defendant's motion for directed verdict on Plaintiff's breach of contract claims and the promissory estoppel claim and the jury returned a verdict in favor of Defendant on Plaintiff's age discrimination claim. This appeal followed.

On appeal, Plaintiff contends the district court erred by: (1) granting a directed verdict in favor of Defendant as to his implied contract, promissory estoppel, and express covenant claims; (2) failing to strike for cause a potential juror who had an economic relationship with Defendant; (3) refusing to admit into evidence a summary of voluminous trial exhibits pursuant to Fed.R.Evid. 1006; and (4) refusing to grant a mistrial based upon judicial misconduct. We address each of Plaintiff's claims in turn.

**1464**

## I.

■■ Plaintiff first contends the district court erred in granting a directed verdict as to his implied contract, promissory estoppel, and express covenant claims. We review the district court's grant of a directed verdict de novo, applying the same standards used by the district court. *Knight v. Snap-on Tools Corp.,* 3 F.3d 1398, 1401 (10th Cir.1993). "A directed verdict is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party, 'points but one way and is susceptible to no reasonable inferences supporting' the nonmoving party." *Id.* (internal citations omitted). Although federal law dictates whether a directed verdict is appropriate, in a diversity action we examine the evidence in terms of the underlying burden of proof as dictated by state law. *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1554 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992).

■ Under Colorado law, an employee hired for an indefinite period of time is an at-will employee, whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action. *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711 (Colo.1987). An employer can be liable for the discharge of an at-will employee, however, where an implied contract arises out of company policy and employment manuals or where an employee relies on the policies and manuals to his detriment. *See id.* at 711–12.

■ Under an implied contract theory, a discharged employee must first show that in promulgating an employment manual or policy, the employer was making an offer to the employee—"that is, the employer manifested his willingness to enter into a bargain in such a way as to justify the employee in understanding that his assent to the bargain was invited by the employer and that the employee's assent would conclude the bargain." *Id.* Additionally, the employee must show that his initial or continued employment constitut-ed acceptance of and consideration for those procedures. *Id.* at 711 (citation omitted).

■■ An offer in the form of an employment manual must be communicated to the employee to be effective, and an employer's limited distribution of its employment manual or policy indicates the employer did not intend the manual to operate as a contractual offer to the employee. *See Kuta v. Joint Dist. No. 50(J),* 799 P.2d 379, 382 (Colo.1990) (employer's limited distribution of RIF policy "undercuts the assertion that it manifested a willingness to enter into a bargain"). An offer must also contain terms "sufficiently definite to enable the court to determine whether the contract has been performed." *Stice v. Peterson,* 144 Colo. 219, 223, 355 P.2d 948, 952 (1960). Finally, while the existence of an implied contract is normally a factual inquiry for the jury, *see Tuttle v. ANR Freight Sys., Inc.,* 797 P.2d 825, 828 (Colo. App.1990), the issue may be decided as a matter of law if the alleged promises are nothing more than "vague assurances." *See Dupree v. United Parcel Service,* 956 F.2d 219, 222 (10th Cir.1992).

### A.

In the instant case, Plaintiff and Defendant did not have a written contract for a definite term of years. Plaintiff, however, contends he had an implied employment contract with Defendant based on Defendant's employment policies. Plaintiff's evidence of an implied contract includes Defendant's: (1) Credo and Code of Ethics; (2) ranking and compensation memorandum; (3) equal opportunity memorandum issued to Defendant's employees; and (4) reduction in force ("RIF") policy.[1] Plaintiff contends these documents taken both individually and collectively are sufficient to form an implied contract.

■ As an initial matter, we reject Plaintiff's argument that he may aggregate documents issued sporadically by Defendant into a legally binding contract without some showing of the elements of a contract as to

---

1. Plaintiff also relies on a memorandum entitled "Special EEO Concerns" to support his implied contract claim. This memorandum is a supplement to Defendant's RIF policy. Therefore, our discussion of Defendant's RIF policy will necessarily include Defendant's "Special EEO Concerns" memorandum.

each document. "Individual factors that do not, as a matter of law, establish [a contract] cannot, by some peculiar alchemy, create a legally binding relationship when combined with each other." *Brooks v. Hilton Casinos, Inc.,* 959 F.2d 757, 761 n. 3 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 300, 121 L.Ed.2d 224 (1992). We therefore address each of Plaintiff's documents in turn.

■ We conclude Defendant's Code of Ethics fails to support an implied contract claim because Plaintiff testified that he "personally [ ] never paid much attention to the [C]ode of [E]thics" and that the policy did not influence whether or not he continued his employment with Defendant. With this admission, Plaintiff has failed to prove an essential element of his claim—*i.e.,* that his continued employment constituted an acceptance of the terms of the Code as part of an implied contract. *See Keenan,* 731 P.2d at 711 (employee must demonstrate continued employment constituted acceptance of the terms of a policy manual).

■ Plaintiff's evidence of Defendant's ranking and compensation memorandum likewise fails to support his implied contract claim. At trial, Plaintiff testified he was not even aware of this document prior to his termination. Because he was unaware of the document prior to his termination, Plaintiff's continued employment could not constitute an acceptance of the terms of the document as part of an implied contract.

■ Plaintiff also points to Defendant's Credo and equal opportunity memorandum as evidence supporting his implied contract claim. Defendant's Credo states that it "believes in the highest ethical standards" and that it was "committed to just management and equality for all . . . and respecting the dignity and privacy due all human beings." Defendant's "equal opportunity" memorandum sets forth Defendant's commitment to "provide equal employment . . . regardless of race, sex, age, handicap, religious belief, honorable military status or national origin."

Plaintiff contends these documents are sufficient to support his implied contract claim. In support of his contention, Plaintiff relies on *Tuttle v. ANR Freight System, Inc.,* 797

P.2d 825, 827 (Colo.App.1990). In *Tuttle,* the defendant's employee handbook stated that the defendant "would not discriminate on the basis of race, sex, religion, or national origin" and that defendant was committed to a "fair and equitable working environment." *Id.* at 828. In conjunction with these statements, the handbook went on to "describe[ ] in detail three main tools [ ] used to determine salaries." *Id.* In light of these detailed salary guidelines which formed the crux of the plaintiff's claims, the Colorado Court of Appeals held that sufficient evidence existed to create a question for the jury as to whether an implied contract existed. *Id.* However, there was no indication in *Tuttle* that absent detailed salary and wage guidelines, the court would have found sufficient evidence to support a finding of an implied contract. *See id.* at 830 (Davidson, J., specially concurring) ("our decision . . . does not hold that the general language concerning equal employment opportunity for all in itself creates a contract"). Likewise, in *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 536 (1994), we relied on *Tuttle* and held that the employer's elaborate sales compensation plan and equal employment policies which emphasized personnel decisions involving compensation created sufficient evidence for a jury to find an enforceable implied contract.

Unlike the employment manuals in *Tuttle* and *Stahl,* in the instant case, Defendant's Credo and equal opportunity memorandum do not contain detailed lay-off guidelines or other guarantees of employment. Rather, Defendant's Credo merely includes general statements to the effect that it is committed to "the dignity and privacy due all human beings" and providing "a safe and healthy workplace." Likewise, Defendant's equal opportunity memorandum merely states the company's general commitment to affirmative action. Statements such as these are merely "vague assurances," *see Dupree,* 956 F.2d at 222, and too indefinite to constitute a contractual offer which would enable a court to determine whether a contract has been performed. *Accord id.* (statement of "[w]e treat our people fairly and without favoritism" too vague to create an implied contract under Oklahoma law). We therefore con-

clude Defendant's Credo and equal opportunity memorandum does not support Plaintiff's implied contract claim.

■ Finally, Plaintiff points to Defendant's RIF policy as supporting his implied contract claim. The record indicates that unlike its company-wide distribution of its Code of Ethics, Defendant merely distributed its RIF policy to management for its use in determining which employees to layoff in the event of a reduction in force. Viewing this evidence in the light most favorable to Plaintiff, Defendant's limited distribution of its RIF policy indicates that Defendant did not manifest a willingness to enter into a contractual relationship with its employees. *See Kuta*, 799 P.2d at 382 (employer's limited distribution of its RIF policy showed that it did not "manifest a willingness to enter into a bargain" with its employees). We therefore conclude Defendant's RIF policy does not support Plaintiff's implied contract claim.

In sum, Plaintiff has failed to produce any evidence from which a reasonable inference may be drawn to support his implied contract claim. *See Knight*, 3 F.3d at 1401. We therefore conclude the district court did not err in directing a verdict in favor of Defendant on this claim.[2]

### B.

■ Plaintiff also asserts a promissory estoppel claim based on Defendant's employment policies. Under Colorado law, if a discharged employee fails to show the existence of an implied contract, the employee may nevertheless enforce the employment manual and procedures under a theory of promissory estoppel if he can demonstrate that (1) the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow policies contained in the manual, (2) the employee reasonably relied on the termination procedures to his detriment, and (3) that injustice can be avoided only by enforcement of the termination procedures. *Keenan*, 731 P.2d at 712. In proving detrimental reliance, the employee must

show action or forbearance taken as a result of the employer's alleged promises. *See Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo. 1983).

In the instant case, Plaintiff's promissory estoppel claim fails because he has not shown that he acted or forbore from acting as a result of Defendant's employment policies. Plaintiff testified that he was unaware of Defendant's ranking and compensation memorandum prior to his termination. Furthermore, Plaintiff testified that as to Defendant's Code of Ethics, he "personally [ ] never paid much attention" to the Code and that the provisions of the Code "did not dictate whether [he] stayed or left" his employment with Defendant. Moreover, there is no indication in the record that the existence of Defendant's RIF policy factored in Plaintiff's decision to continue his employment with Defendant. Under these circumstances, Plaintiff has failed to produce evidence of detrimental reliance warranting submission of his promissory estoppel claims to the jury. We therefore conclude the district court did not err in granting Defendant's motion for directed verdict as to this claim.

### II.

■ Plaintiff next contends the district court erred in failing to strike a prospective juror for cause. Plaintiff contends the district court should have presumed actual bias on the part of juror Wahtola because, as an employee of a company which does consulting work for the Defendant, he had a significant economic relationship with Defendant.

At the commencement of voir dire, the district court asked all of the prospective jurors, "I first want to know whether any of you either yourselves or members of your family or close friends have now or have had in the past any connection with [Defendant] in terms of employment." In response, prospective juror Wahtola informed the court that he had previously been a consultant for Defendant and that his current employer, Woodward Clyde Consultants, held a consult-

---

**2.** Having concluded Plaintiff has failed to present sufficient evidence to support the submission of his implied contract claims to the jury, we also necessarily conclude the district court did not err in granting a directed verdict as to Plaintiff's express covenant claims.

ing contract with Defendant and employed several of Defendant's former employees. The following colloquy occurred:

THE COURT: All right. Taking the last first, do you know anything about the employment history of those persons with Martin Marietta?

MR. WAHTOLA: I interviewed them for their jobs, and so yes, I do.

THE COURT: And do you know whether any or several of them were laid off under a reduction in force?

MR. WAHTOLA: Two of them were.

THE COURT: And do you know when that was?

MR. WAHTOLA: Within the last year.

THE COURT: And did any of them give you any information or views about the layoff?

MR. WAHTOLA: Well, they weren't real pleased with it. So, the answer is yes, but not in any great detail.

THE COURT: And did you form any views or opinions about the action of Martin Marietta in that connection?

MR. WAHTOLA: As you were talking with them, it would be very difficult not to. But like I said, they are also a very good client of ours.

THE COURT: Which cuts the other way. Well—

MR. WAHTOLA: Yes, it does.

THE COURT: What do you think with respect to your ability fairly to judge in this case?

MR. WAHTOLA: I hope I could do it fairly.

THE COURT: And you intend to do so?

MR. WAHTOLA: Yes, sir.

At some later point during voir dire, the court asked Wahtola whether he recalled reading any newspaper accounts of layoffs or reductions in force at Defendant's company. The following colloquy occurred:

MR. WAHTOLA: It's in the papers quite frequently with the defense cutbacks.

. . . . .

THE COURT: Items like this, do you normally read them through?

MR. WAHTOLA: Just in general.

THE COURT: and that's in part because—

MR. WAHTOLA: Their [sic] clients.

THE COURT: —of your company's work and whether it's going to be a future effect on your company, right?

MR. WAHTOLA: That's correct.

. . . . .

THE COURT: And do you believe that you could and would fairly and impartially decide in this case?

MR. WAHTOLA: Yes.

Following the completion of voir dire, Plaintiff challenged Wahtola for cause and the district court denied the challenge. Plaintiff then exercised a peremptory challenge to excuse Wahtola from the jury.

 We review the district court's refusal to strike a juror for cause for an abuse of discretion, *United States v. Bedonie,* 913 F.2d 782, 795 (10th Cir.1990), *cert. denied,* 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991), keeping in mind that "the district court is in the best position to observe the juror and to make a first-hand evaluation of his ability to be fair." *Wilson v. Johns–Manville Sales Corp.,* 810 F.2d 1358, 1361 (5th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). Generally, a court must grant a challenge for cause if the prospective juror's actual prejudice or bias is shown, *Bedonie,* 913 F.2d at 795 (citing *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976)), and "an improper denial of a challenge for cause is error as it forces a party to use a peremptory challenge." *Hopkins v. County of Laramie, Wyoming,* 730 F.2d 603, 605 (10th Cir.1984). Actual bias may be shown either by a juror's express admission, or by proof of specific facts which show the juror has such a close connection to the facts at trial that bias is presumed. *Burton v. Johnson,* 948 F.2d 1150, 1158 n. 10 (10th Cir.1991).

"By definition, presumed bias depends heavily on the surrounding circumstances," *Nell,* 526 F.2d at 1229, and the district court "must properly test the qualifications and competency of the prospective jurors to sit

on trial of the case." *Bedonie,* 913 F.2d at 795 (quoting *United States v. Hill,* 526 F.2d 1019, 1025 (10th Cir.1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976)). In some instances, courts have rejected a presumption of bias on the part of a juror despite the existence of a relationship between the prospective juror and a party to the lawsuit. In *Poynter v. Ratcliff,* 874 F.2d 219, 222 (4th Cir.1989), the Fourth Circuit rejected a presumption of bias on the part of a juror who was a patient of a defendant/doctor in a medical malpractice case. The court noted that "[a]lthough a particular patient ... might warrant excuse for cause, ... we do not think [the circumstance] necessarily impairs a juror's partiality or prevents him from rendering a decision based solely on the evidence and the law." *Id.; see also United States v. Bradshaw,* 787 F.2d 1385, 1390 (10th Cir.1986) (juror's prior business dealings with a government witness insufficient to presume bias).

On the other hand, courts have presumed bias in extraordinary situations where a prospective juror has had a *direct* financial interest in the trial's outcome, *see, e.g., Gladhill v. General Motors, Corp.,* 743 F.2d 1049, 1050–51 (4th Cir.1984) (stockholder in corporation which is party to lawsuit is incompetent to serve on a jury), or where the prospective juror was an employee of a party to a lawsuit, *see, e.g., Francone v. Southern Pacific,* 145 F.2d 732, 733 (5th Cir.1944) (employee of a party to a lawsuit presumptively incompetent to serve on a jury). In these situations, the relationship between the prospective juror and a party to the lawsuit "point[s] so sharply to bias in [the] particular juror" that even the juror's own assertions of impartiality must be discounted in ruling on a challenge for cause. *Nell,* 526 F.2d at 1229 n. 8.

In the instant case, we conclude Wahtola's employment with a company which had a consulting contract with Defendant does not constitute an exceptional circumstance warranting a presumption of bias. Unlike instances where a stockholder has been excused for cause, the record contains no evidence to indicate that by virtue of his employment, Wahtola had a *direct* financial in-

terest in the outcome of the lawsuit. Moreover, Wahtola's status as an employee of a company that performed consulting work for Defendant is more remote than that of an actual employee of a party to a lawsuit. Finally, the record reflects the district court questioned Wahtola at length concerning his relationship with the Defendant and was satisfied that Wahtola could serve impartially. Indeed, Wahtola himself assured the court he could be impartial. Under these circumstances, we conclude the district court did not abuse its discretion in failing to excuse Wahtola for cause.

### III.

■■■■■ Plaintiff next contends the district court erred in excluding a summary of documents which purported to show that "older employees were placed at the bottom of ranking lists while younger, less experienced employees were placed at the top." *See* Fed.R.Evid. 1006. We review the district court's exclusion of a summary under Rule 1006 for an abuse of discretion. *Harris Market Research v. Marshall Marketing,* 948 F.2d 1518, 1525 (10th Cir.1991).

At trial, the district court conducted an extensive bench conference on the admissibility of the summary. In response to questioning by the court, Plaintiff's counsel was unable to explain to the court the meaning of the "value rank" category contained in the summary. The district court responded, "Well, I would expect you to be able to explain it while we're discussing it. If you don't know what's in an exhibit, I'm not going to receive it." The district court then excluded the summary.

A summary of records may be properly admitted into evidence provided "all of the records from which it is drawn are otherwise admissible." *Harris Market,* 948 F.2d at 1525 (quoting *State Office Sys., Inc. v. Olivetti Corp. of America,* 762 F.2d 843, 845 (10th Cir.1985)). However, "[b]efore submitting summaries or charts for a jury's inspection, ... [c]are must be taken to insure [the] summaries accurately reflect the contents of the underlying documents." *United States v. Drougas,* 748 F.2d 8, 25 (1st Cir.1984). In light of Plaintiff's counsel's inability to ex-

plain relevant portions of the summary to the district court, the district court was unable to assure itself of the accuracy of the information contained therein, and therefore did not abuse its discretion in excluding Plaintiff's summary.

## IV.

■ Finally, Plaintiff contends the district court erred in failing to grant a mistrial based upon alleged judicial misconduct. Plaintiff's allegations of judicial misconduct consist of several incidents during the course of the trial. Plaintiff's counsel contends the district court made certain comments in front of the jury that portrayed them as incompetent and also treated witnesses in a harsh and abrasive manner. We review the denial of a motion for a mistrial for an abuse of discretion. *United States v. Martinez*, 979 F.2d 1424, 1431 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993).

During the direct examination of Plaintiff, the court commented that one of counsel's questions was "irrelevant" and "a waste of time." Additionally, the court interrupted several witnesses in order to confine their answers to the question or to clarify the questions asked by counsel. At another point, at a bench conference following the testimony of Loney Peralta, the court asked, "How many more witnesses [were there] going to be like Mr. Peralta." In response to Plaintiff's assertion that there would be none, the court commented, "That's good because I won't hear any more testimony like this with hallway conversation." Plaintiff contends the jury heard the court's comment. Additionally, at the first day of trial, Plaintiff's counsel informed the court that there were no other available witnesses for the day. In response, the court stated, "Well, I'm not interested in that. It's a question of wasting the jury's time." Later, in excusing the jury, the court stated, "Well, we've run out of witnesses, members of the jury. So we don't have anybody else for you to hear at this time. It's poor planning, but that's the way it goes and sometimes we just have to take it." Plaintiff contends these comments in addition to the court's treatment of witnesses warranted a mistrial. We disagree.

"Trial court judges are, necessarily, afforded considerable discretion in determining the conduct of a trial, including the orderly presentation of evidence." *Gilbert v. Cosco, Inc.*, 989 F.2d 399, 403 (10th Cir.1993) (quoting *Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir.1987)). In facilitating the presentation of evidence, the trial judge "is allowed to participate in a trial and ask questions of witnesses in order to ascertain the facts," *United States v. Wheeler*, 444 F.2d 385, 390 (10th Cir.1971), and to "clarify the issues [and] assist the jury in eliminating immaterial matters." *Smith v. Welch*, 189 F.2d 832, 835 (10th Cir.1951).

■ Because a trial judge is given considerable discretion in determining the conduct of a trial, *see Gilbert*, 989 F.2d at 403, "[t]he standard for reversal on the basis of judicial misconduct in a civil trial is [ ] quite high." *Pau v. Yosemite Park and Curry Co.*, 928 F.2d 880, 885 (9th Cir.1991). Reversal is not required where the judge emphasizes evidence or expresses skepticism at a witness' answer, provided the witness has an opportunity to respond. *Id.* Additionally, "[c]utting comments to counsel, particularly those relating to skill rather than good faith or integrity, will not generally mandate reversal." *Id.*

■ In the instant case, none of the instances complained of by Plaintiff warranted a mistrial. As to Plaintiff's claim of mistreatment of witnesses, a review of the record indicates that the court was merely attempting to "clarify the issues [and] assist the jury in eliminating immaterial matters." *Smith*, 189 F.2d at 835. Furthermore, despite Plaintiff's contentions to the contrary, the record indicates that the jury could not have overheard the district court's "hallway conversation" comment because the jury had been excused prior to the comment. Moreover, we view the district court's comment to the jury that "we've run out of witnesses [and] it's poor planning" as a reasonable explanation to the jury as to why the trial could not continue on the day in question. We therefore conclude the district court did not abuse its discretion in denying Plaintiff's

motion for a mistrial based on judicial misconduct.

AFFIRMED.