Jacquline SEYLER, Plaintiff,

v.

BURLINGTON NORTHERN SANTA FE CORPORATION, Burlington Northern Santa Fe Railway Company, and National Railroad Passenger Corporation D/B/A Amtrak, Defendants.

No. CIV.A.99–2342–KHV.

United States District Court, D. Kansas.

Nov. 17, 2000.

Daniel D. Owen, Shughart, Thomson & Kilroy, Overland Park, KS, P. John Brady, Shughart, Thomson & Kilroy, Kansas City, MO, for Plaintiff.

Douglas R. Richmond, Michael L. Matula, Der5ek E. Feagans, Armstrong Teasdale, LLP, Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

On August 9, 1997, Jacquline Seyler sustained injuries in a passenger train derail-

ment near Kingman, Arizona. She filed suit against the National Railroad Passenger Corporation (Amtrak), which operated the train, and Burlington Northern Santa Fe Corporation and Burlington Northern Santa Fe Railway Company (BNSF),[1] which owns and maintains the railroad track and bridge on which the train was traveling at the time of the derailment. On May 31, 2000, the Court sustained defendants' motions for summary judgment on the issue of punitive damages. At trial, defendants did not contest liability for plaintiff's injuries. On June 12, 2000, a jury returned a $295,772.00 verdict in plaintiff's favor. The matter is before the Court on plaintiff's Motion For New Trial (Doc. # 155) filed June 28, 2000; plaintiff's Motion To Alter Or Amend (Doc. # 157) filed June 28, 2000; and plaintiff's Motion For Extension Of Time For Appeal (Doc. # 166) filed August 9, 2000. For reasons set forth below, the Court overrules plaintiff's motions.

Regrettably, the Court must first analyze whether plaintiff timely filed her post-trial motions. In opposing plaintiff's motions to alter or amend and for a new trial, and her further motion for an extension of time to file an appeal, defendants argue that the post-trial motions are untimely and that the Court should deny the request to extend the time to appeal. Plaintiff has not filed a reply brief which addresses the issue of timeliness. Although reply briefs are not required, plaintiff has elected to ignore important procedural issues and authorities which defendants have cited.

## I. Timeliness Of Plaintiff's Motions To Alter Or Amend And For New Trial

### A. Plaintiff's Motion To Alter Or Amend

■ On May 31, 2000, the Court sustained defendants' motions for summary judgment on the issue of punitive damages, as well as several motions in limine.

---

1. BNSF was formed in 1995 when the Santa Fe Railway merged with Burlington Northern.

See Memorandum And Order (Doc. # 123). The Court's rulings on May 31, 2000 were non-dispositive, in that they did not fully resolve the case and could be challenged by a timely motion under Rule 7.3(b), D. Kan. On June 12, 2000, after trial on the remaining issues, the Clerk entered judgment. Accordingly, the previous interlocutory rulings on punitive damages and motions in limine merged into the final judgment. See *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 527 (10th Cir.1992) (interlocutory rulings merge into final judgment and become appealable once final judgment is entered); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 781 (2d Cir.1999) (earlier grant of partial summary judgment merges into final judgment). After judgment had been entered, plaintiff was required to bring any challenge to the Court's rulings on punitive damages and motions in limine under Rule 59(e). In fact, plaintiff stated in her motion to alter or amend that it was filed pursuant to Rule 59(e). A motion under Rule 59(e) must be filed no later than 10 days after entry of judgment. See Fed.R.Civ.P. 59(e). "The requirement that post-trial motions be filed within the relevant ten day period after entry of judgment is jurisdictional, and may not be extended by a waiver of the parties or by a rule of the district court." *U.S. Leather, Inc. v. H & W Partnership*, 60 F.3d 222, 225 (5th Cir.1995); see Fed.R.Civ.P. 6(b) (district court cannot extend deadline to file Rule 59 motion). Here, the Clerk entered judgment on June 12, 2000. After excluding intervening Saturdays and Sundays, motions to alter or amend were due on June 26, 2000. Plaintiff did not file her motion until June 28, 2000. Plaintiff's motion to alter or amend is untimely under Rule 59(e). The Court will therefore construe plaintiff's motion as one under Rule 60(b), which is not governed by the same ten-day time limitation found in Rule 59.

## B. Plaintiff's Motion For New Trial

Plaintiff's motion for new trial is also time-barred. Any motion for a new trial must be filed no later than ten days after entry of judgment. See Fed.R.Civ.P. 59(b). The Court cannot extend the deadline to file a new trial motion. See Fed. R.Civ.P. 6(b). Plaintiff filed her motion for new trial on June 28, 2000, twelve days after judgment had been entered. Accordingly, plaintiff's motion for new trial is untimely.[2]

## II. Plaintiff's Motion For Extension Of Time To Appeal

As explained above, plaintiff did not timely file a post-trial motion under Rule 59, Fed.R.Civ.P. Accordingly, she was required to file a notice of appeal within 30 days of the date of judgment. See Fed. R.App. P. 4(a)(1)(A). The deadline to appeal the judgment was July 12, 2000. On August 9, 2000, plaintiff asked the Court for an extension of time to file her appeal in the event that the Court found that her post-trial motions were untimely. When a party aggrieved by a judgment fails to file a timely notice of appeal, a district court may extend the time to file a notice of appeal if the moving party shows that her failure was the result of "excusable neglect." See Fed.R.App. P. 4(a)(5).[3]

---

**2.** On June 14, 2000, plaintiff requested an extension of time to file any motions to modify the "Court's Orders concerning summary judgment and matters in limine." See Motion To Enlarge Time (Doc. # 148). Plaintiff did not request an extension of time to file a motion for new trial. Even if she had done so, the Court did not have authority to grant such an extension. See Fed.R.Civ.P. 6(b).

**3.** The "good cause" standard referenced in the rule is only applicable to motions for enlargement of time filed within 30 days of

the entry of judgment. See, e.g., *Makin v. Department of Corrections*, 13 F.3d 406, 1993 WL 523205, at *1 (10th Cir. Dec.15, 1993); *Chavez v. Public Defender Dep't State of N.M.*, 946 F.2d 900, 1991 WL 214683, at *1 (10th Cir. Oct.22, 1991); *Thompson v. E.I. DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 532 (4th Cir.1996); *Allied Steel v. City of Abilene*, 909 F.2d 139, 143 n. 3 (5th Cir.1990); *Vogelsang v. Patterson Dental Co.*, 904 F.2d 427, 431 (8th Cir.1990); *Borio v. Coastal Marine Constr. Co.*, 881 F.2d 1053 (11th Cir.1989); *Marsh v. Richardson*, 873 F.2d 129, 130 (6th Cir.1989);

The equitable determination of excusable neglect involves all relevant factors including "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).

■ Here, defendants have not shown any prejudice from the delay. In addition, the length of the delay will not significantly disrupt judicial proceedings and defendants have not shown that plaintiff acted in bad faith. The third factor, i.e. the reason for the delay, however, strongly weighs in favor of defendants. The Tenth Circuit has noted that "fault in the delay remains a very important factor—perhaps the most important single factor—in determining whether neglect is excusable." *City of Chanute, Kan. v. Williams Natural Gas Co.*, 31 F.3d 1041, 1046 (10th Cir. 1994), *cert. denied.*, 513 U.S. 1191, 115 S.Ct. 1254, 131 L.Ed.2d 135 (1995). Although the Supreme Court has noted that "excusable neglect" may encompass some situations in which the failure to comply with a deadline is attributable to negligence, Pioneer, 507 U.S. at 394, 113 S.Ct. 1489, "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect," *id.* at 392, 113 S.Ct. 1489. Accordingly, even absent prejudice to the opposing party or disruption of judicial proceedings, a party's failure to read and follow the plain terms of the federal rules does not constitute excusable neglect. See *Halicki v. Louisiana Casino Cruises, Inc.*, 151 F.3d 465, 469–70 (5th Cir.1998); *Advanced Estimating Sys., Inc. v. Riney*, 130 F.3d 996, 999 (11th Cir.1997); *Prizevoits v. Indiana Bell Tel. Co.*, 76 F.3d 132, 134 (7th Cir.1996);

*Kyle v. Campbell Soup Co.*, 28 F.3d 928, 931–32 (9th Cir.), *cert. denied*, 513 U.S. 867, 115 S.Ct. 185, 130 L.Ed.2d 119 (1994); *Weinstock v. Cleary, Gottlieb, Steen & Hamilton*, 16 F.3d 501, 503 (2d Cir.1994); *United States v. Andrews*, 790 F.2d 803, 806 (10th Cir.1986), *cert. denied*, 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 505 (1987).

In *Weitz v. Lovelace Health Sys., Inc.*, 214 F.3d 1175 (10th Cir.2000), the district court sustained plaintiff's motion to extend the time to file Rule 59(e) motions until 24 days after judgment had been entered. See *id.* at 1178. On appeal, plaintiff argued that the Tenth Circuit should consider her untimely appeal because of "unique circumstances" justifying the delay. Plaintiff maintained that the ten day time limit for Rule 59(e) motions should be extended because counsel relied on the extension granted by the district court. See *id.* at 1178–79. The Tenth Circuit noted that the Federal Rules of Civil Procedure expressly preclude a district court from extending the ten day time limit for Rule 59(e) motions. See *id.* at 1180; Fed. R.Civ.P. 6(b). Accordingly, counsel's reliance on the extension granted by the district court was not reasonable. See *id.* at 1179–80. The Tenth Circuit noted that even a passing reference to the rules reveals that a district court cannot extend the deadline for Rule 59(e) motions. See *id.* at 1180.

■ Based on the reasoning of Weitz and after considering the Pioneer factors, the Court finds that in failing to file a timely notice of appeal, counsel could not reasonably have relied on the Court's order which extended the time for plaintiff to file "motions to modify"—an order which counsel for plaintiff prepared. Moreover, such reliance could not result from "excusable neglect." Therefore, plaintiff's mo-

---

*Parke–Chapley Constr. Co. v. Cherrington*, 865 F.2d 907, 909–10 (7th Cir.1989); *650 Park Ave. Corp. v. McRae*, 836 F.2d 764, 766 (2d Cir.1988); *State of Or. v. Champion Int'l Corp.*, 680 F.2d 1300, 1301 (9th Cir.1982);

but see *Pontarelli v. Stone*, 930 F.2d 104, 109–10 (1st Cir.1991). Even if the Court were to evaluate plaintiff's motion under the good cause standard set forth in Rule 4(a)(5)(B), it would reach the same result.

tion to extend the deadline to file a notice of appeal is overruled.

## III. Plaintiff's Motion To Alter Or Amend Judgment

### A. Legal Standards

As explained above, the Court construes plaintiff's motion to alter or amend as one for relief from judgment under Rule 60(b)(1) and (6), Fed.R.Civ.P.[4] Relief under Rule 60(b) is extraordinary and may only be granted in exceptional circumstances. *Yapp v. Excel Corp.*, 186 F.3d 1222 (10th Cir.1999); *Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., Inc.*, 909 F.2d 1437, 1440 (10th Cir.1990). A Rule 60(b) motion is not intended to be a substitute for a direct appeal. See *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 576 (10th Cir.1996).

■ Under Rule 60(b)(1), the Court may grant relief from a judgment or order for mistake, inadvertence, surprise or excusable neglect. As a general proposition, the "mistake" provision in Rule 60(b)(1) provides for reconsideration of judgments only where (1) a party has made an excusable litigation mistake or an attorney in the litigation has acted without authority from a party, or (2) the court has made a substantive mistake of law or fact in the final judgment or order. *Yapp*, 186 F.3d at 1231. Relief may be granted under Rule 60(b)(1) on a theory of mistake of law, when the Rule 60(b) motion is filed before the time to file a notice of appeal has expired. *Van Skiver v. United States*, 952 F.2d 1241, 1244 (10th Cir.1991), cert. denied, 506 U.S. 828, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992); *Morris v. Adams–Millis Corp.*, 758 F.2d 1352, 1358 (10th Cir. 1985). Relief under Rule 60(b)(1) is available only for obvious errors of law or fact. See *Van Skiver*, 952 F.2d at 1244; *Rojas v. American Postal Workers Union*, No. 94–1083–JTM, 1998 WL 288665, at *1 (D.Kan. May 5, 1998) ("Arguments that the court misapplied the law or misunder-

stood a party's position are properly brought under Rule 59(e), but do not justify relief under Rule 60(b)."); *Cepero v. Board of Immigration Appeals*, No. 92–3046–RDR, 1996 WL 755344, at *6 (D.Kan. Dec.27, 1996) (relief under Rule 60(b)(1) not justified where party rehashes previous arguments and argues that the court overlooked certain facts); see also *Alvestad v. Monsanto Co.*, 671 F.2d 908, 912–13 (5th Cir.) (relief under Rule 60(b)(1) limited to "perfunctory correction" of obvious errors of law), cert. denied, 459 U.S. 1070, 103 S.Ct. 489, 74 L.Ed.2d 632 (1982); *Rocky Mountain Tool & Mach. Co. v. Tecon Corp.*, 371 F.2d 589, 596–97 (10th Cir.1966) ("palpably erroneous award" of interest from date of filing counterclaim rather than from date of entry of judgment correctable under Rule 60(b)(1)). If the factual and legal conclusions in the order are "arguable," Rule 60(b)(1) does not provide a basis for relief. See *Van Skiver*, 952 F.2d at 1244. Plaintiff has not alleged any obvious error of law or fact within the meaning of Rule 60(b)(1). Accordingly, relief under that rule is not warranted.

Rule 60(b)(6) provides that the Court may relieve a party from "a final judgment, order, or proceeding for ... any ... reason justifying relief from the operation of the judgment." Relief under Rule 60(b)(6) is even more difficult to attain than under Rule 60(b)(1) and is appropriate only "when it offends justice to deny such relief." *Yapp*, 186 F.3d at 1232 (quoting Cashner, 98 F.3d at 580). Plaintiff has not satisfied this standard. The Court therefore declines to grant relief under Rule 60(b)(6).

Although plaintiff's motion to alter or amend is clearly insufficient under Rule 60(b)(1) and 60(b)(6), the Court will nevertheless briefly evaluate the merits of plaintiff's arguments.

---

**4.** Plaintiff does not raise any arguments which fall within the other subsections of

Rule 60(b).

## B. Factual Background

In its Memorandum And Order of May 31, 2000, the Court set forth pertinent factual background, which is incorporated by reference. The following is a brief summary.

During the late evening of August 8 and the early morning of August 9, 1997, plaintiff was a passenger on the Amtrak Southwest Chief train traveling from Los Angeles, California to Lawrence, Kansas. Heavy rains, thunderstorms and flash floods hit the area east of Kingman, Arizona on that evening. BNSF delayed the Southwest Chief so that its track supervisor Michael Putt could make a special inspection of the track east of Kingman. Putt stopped and inspected the bridge at mile post ("MP") 504.1 near Kingman ("bridge 504.1S"), but did not see any problem; he believed that the bridge was safe for passenger train travel. Fifteen minutes before the accident, a westbound train passed over bridge 504.1N. Its lead locomotive engineer looked at bridge 504.1S but did not notice anything irregular about it. At approximately 5:43 a.m. MDT, BNSF released the Southwest Chief from Kingman. As the Southwest Chief approached bridge 504.1S, its engineers saw a "hump" in the tracks at the bridge, but could not stop the train before it derailed.[5] A flash flood warning for the area

had expired five minutes after the train derailed.

## C. Rulings On Motions In Limine

■ Plaintiff contends that the Court erred by excluding evidence of three prior bridge failures. In its previous order, the Court excluded a script regarding the incidents which Don Lozano prepared after the Kingman accident for internal scour awareness training at BNSF. Plaintiff argues that even though the script is a subsequent remedial measure, Lozano's testimony regarding the three incidents should not be excluded. Even if the Court were to consider Lozano's testimony, it would reach the same result on BNSF's motion for summary judgment. In his deposition, Lozano gave sketchy details of the bridge collapses in 1981, 1983 and 1990. Without reference to Lozano's training script, the three incidents are not helpful (or understandable) for a jury.[6] Moreover, Lozano testified that he did not have personal knowledge of the three incidents, that others had told him different stories about the incidents, and that for teaching effect he made up many of the "facts" in the training materials and/or chose the best story. See, e.g., Lozano Depo. at 42–43, 51, 58 (received different stories about 1981 incident, unsure whether inspectors even looked at bridge on the same day before it collapsed); id. at 44, 257 (did not feel

---

**5.** Plaintiff challenges the Court's factual finding that a head cut caused bridge 504.1S to fail. The Court based its finding on BNSF's statement of fact 24, which plaintiff did not properly controvert. In response to fact 24, plaintiff did not argue or present any evidence of an alternative cause for the bridge failure. See Plaintiff's Response Defendant Burlington Northern Santa Fe's Motion For Partial Summary Judgment (Doc. # 105) filed March 24, 2000 at 10–11 (head cuts are natural and frequent phenomenon, "Defendant's expert admits that the head cut which destroyed bridge 504.1S on August 9, 1997, may have originated as the result of the railroad's artificial constriction of the natural water flow in the area."). After carefully reviewing plaintiff's response and the citations therein, the Court cannot find any basis in fact (or argument) for her conclusion that poor mainte-

nance of the cross wall caused bridge 504.1S to collapse. In her motion to alter or amend judgment, plaintiff refers to testimony of Steve Milsap, which was not included in her opposition to statement of fact 24. In any event, Milsap did not testify that a faulty cross wall caused bridge 504.1S to collapse.

**6.** For example, Lozano testified that in his training program, he tells students that during a heavy rain in 1990, overflows reached bridge 645.3 in Arizona and caused the center pier under the south track to be undermined. See Lozano Depo. at 393, 401. The training script provides the detail that a track inspector did some minor work on bridge 645.3 but failed to discover the broken pier. Likewise, for the 1981 and 1983 incidents, the training script provides necessary details which Lozano did not discuss in his deposition.

information was necessarily reliable, only that information was appropriate for training presentation). Based on Lozano's testimony, plaintiff could not meet her burden of showing that the three incidents were "substantially similar" to the accident near Kingman.

Plaintiff also argues that the Court erred by excluding evidence of the BNSF budget for bridge upkeep and replacement. As the Court explained previously, bridge 504.1S had not been recommended for replacement at any time after 1979. Although the bridge replacement budget influenced the number of bridges which were actually replaced, plaintiff has not shown that the BNSF budget influenced the recommendations of bridge inspectors to put certain bridges on the list for replacement. Absent a recommendation for replacement after 1979, evidence that other field engineers could not obtain funding to improve other bridges because of the BNSF budget is not probative of defendants' negligence (or malice) with respect to bridge 504.1S or the derailment of the Southwest Chief.

### D. Summary Judgment Ruling

Plaintiff argues that the Court erred when it sustained BNSF's motion for partial summary judgment on punitive damages. To recover punitive damages under Arizona law, plaintiff has the burden of proving by clear and convincing evidence, either direct or circumstantial, that (1) defendant acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others or (2) defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. See *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 758 P.2d 1313, 1324 (1988); *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 733 P.2d 1073, 1080 , *cert. denied*, 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987). Punitive damages cannot be based merely on evidence of defendant's gross negligence or reckless disregard of the circumstances.

See *Volz v. Coleman Co.*, 155 Ariz. 567, 748 P.2d 1191, 1194 (1987) (en banc). In determining whether plaintiff has satisfied her burden, the Court evaluates "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred[,] ... [t]he duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it." *Thompson v. Better–Bilt Alum. Prods. Co.*, 171 Ariz. 550, 832 P.2d 203, 209 (1992) (en banc) (quoting *Hawkins*, 733 P.2d at 1080).

Plaintiff again argues that the following facts are sufficient for a reasonable jury to award punitive damages in her favor: (1) BNSF did not replace bridge 504.1S which had a known dangerous condition, (2) BNSF sent an untrained employee to inspect the bridge immediately prior to the derailment, and (3) BNSF did not inform the Amtrak train crew of the danger posed by flash flooding in the area. The Court will briefly address each of plaintiff's contentions separately and then in combination.

#### 1. BNSF Failure To Replace The Bridge

In 1975, BNSF chose to install a cross wall near bridge 504.1S as a solution for erosion problems. Plaintiff asserts that the Court "completely ignored" evidence that Jack King, the BNSF bridge engineer for Arizona, did not agree that the cross wall was an appropriate measure to address the erosion problems. By May 1976, however, King agreed with the cross wall solution. Plaintiff offered no evidence to support her theory that after 1976, King thought that the cross wall was unsafe or would not protect the bridge from erosion.

Plaintiff again contends that after the cross wall was installed, BNSF repeatedly overruled bridge inspector recommendations to replace bridge 504.1S. Plaintiff has not provided clear and convincing evidence to support her assertion. As an initial

matter, plaintiff has not presented any evidence that BNSF "overruled" any requests for bridge replacement. Moreover, regardless of the precise dates in the 1970s that Walters and George recommended replacement of bridge 504.1S, neither individual (or any other BNSF employee) recommended replacement of the bridge in the following 18 years.

Plaintiff apparently bases her punitive damage claim on the theory that BNSF intentionally "covered up" problems at bridge 504.1S. For example, plaintiff argues that the inspections of bridge 504.1S in 1995 and 1997, during budget inspections of other bridges, show that BNSF knew that the bridge posed a danger. The Court stated in its prior order:

> Although the precise reason why the crews inspected bridge 504.1S in 1995 and 1997 is unclear, plaintiff has failed to show that based on the inspection, BNSF was consciously aware of any danger at the bridge. Walters did not identify bridge 504.1S as a possible candidate for renewal or replacement. During the 1995 and 1997 inspections, no one took exception to the condition of the bridge. Walters, George, Dout, Michelbook, and Burns all testified that they did not consider bridge 504.1S to be dangerous and, had they believed a danger existed, that they would have either fixed the condition or at least noted it somewhere. Although plaintiff may be able to show that the crew was negligent for failing to recognize the bridge or cross wall as a danger, no evidence suggests that the engineers or other BNSF employees thought that the bridge posed a substantial risk.

Memorandum & Order (Doc. # 123) at 38–39 (footnote omitted).

■ Plaintiff argues that the "mere existence of the special inspections demonstrated some concern about the condition of the bridge." The Court agrees that the BNSF engineers stopped at bridge 504.1S because of "some concern" about its condition, but the fact that the engineers did not note any problem with the bridge suggests that any concern was alleviated by the inspection or, at a minimum, that any concern was unworthy of note. Plaintiff's theory, apparently, is that in 1995 and 1997, the inspectors actually wanted to recommend the bridge for major repairs or replacement but did not do so for some unknown reason. This theory is unsupported by the record and, in any event, would not warrant an award of punitive damages. For example, plaintiff does not explain why the engineers listed, inspected and noted defects on a number of bridges other than bridge 504.1S.[7] In 1995 and 1997, engineers inspected and noted defects on nearby bridges 501.5 and 505.9. Why would the engineers list other bridges as "concerns" and recommend replacement, but not do so for bridge 504.1S? Based on the record, the only reasonable conclusion is that the inspectors were wrong about the condition of bridge 504.1S, i.e. they failed to appreciate that the bridge, its cross wall and/or the head cut from downstream constituted a safety hazard. Poor decisions alone, however, are not clear and convincing evidence that the inspectors consciously disregarded a substantial risk of harm. In sum, no reasonable jury would find that BNSF's failure to replace the bridge was based on a conscious decision to ignore the substantial risk of erosion from a head cut.

### 2. BNSF Decision To Send Putt To Inspect The Bridge

■ Plaintiff next claims that BNSF acted with an evil mind because it sent track supervisor Putt, instead of a bridge inspector, to inspect the track ahead of the

---

**7.** On the list of bridges to be inspected, BNSF noted the following defects: cracks in concrete and beams; rotten or poor timbers, stringers and pilings; drainage problems; poor under traffic. Exhibit 1 to Affidavit of Byron Burns, attached as exhibit J to Defendant BNSF's Memorandum Supporting Its Motion For Partial Summary Judgment (Doc. # 83) filed March 1, 2000. During the inspections, bridge engineer Burns noted similar defects regarding other bridges. See id., exhibit 2.

Southwest Chief. Plaintiff points out that BNSF made this decision despite three prior incidents in which untrained inspectors had failed to detect an imminent bridge collapse during high water. As explained above, plaintiff's evidence regarding the three prior incidents is inadmissible. See supra. In its prior order the Court noted that even if the evidence were admissible, no reasonable jury would find from the fact that BNSF sent Putt, instead of a bridge inspector, that BNSF had the requisite evil mind. The Court relied in part on the fact that the decision to send Putt complied with the pertinent federal regulation which specifically addresses a railroad's obligation to inspect its track in bad weather. See 49 C.F.R. § 213.239. Plaintiff argues that compliance with the federal regulation is irrelevant because it addresses track inspections, not bridge inspections. Plaintiff does not cite any applicable federal regulation for inspection of bridges in bad weather and she does not dispute defendants' argument that no such regulation exists. Obviously, an inspection of the track over a bridge would reveal many problems caused by flooding. The fact that the federal regulation applies only to track inspections suggests that the federal government concluded that most safety defects caused by a storm or high water could be discovered during such an inspection. Absent a specific regulation on bridges, the Court finds that BNSF's compliance with the pertinent regulation negates a claim that BNSF consciously ignored a "substantial risk" of harm to others by sending a track inspector instead of a bridge inspector.

### 3. BNSF Failure To Inform Amtrak Crew Of Flooding

Plaintiff claims that BNSF had an evil mind because dispatcher Newton did not inform the crew of the Southwest Chief of recent weather reports. In its prior order, the Court held as a matter of law that plaintiff had not shown clear and convincing evidence that Newton was "conscious" of a "substantial risk" in his actions. Plaintiff again maintains that Newton knew that in "unusually heavy rain, storm, or high water, trains and engines must approach bridges, culverts, and other potentially hazardous points prepared to stop," Operating Rule § 6.21, and that a reasonable jury could therefore infer that he acted in conscious disregard of a substantial risk of injury when he failed to inform the Amtrak crew of a flash flood warning which included bridge 504.1S. Although Newton knew of the operating rule, he also knew that in response to reports of heavy rain, BNSF had dispatched Putt to look over the track ahead of the Southwest Chief. He testified that because of Putt's inspection, he did not think the heavy rains were a hazard for train traffic. Newton was not aware of any accidents occurring immediately after a track inspection. Newton may have incorrectly discounted the threat from flash floods based on Putt's inspection, but no reasonable jury could find that he or BNSF did so with a conscious disregard for the safety of others.

### 4. Combined Conduct

For the reasons stated in its prior order and those set forth above, the Court finds as a matter of law that an award of punitive damages against BNSF is unwarranted. See generally *Ranburger v. Southern Pac. Transp. Co.*, 157 Ariz. 551, 760 P.2d 551, 554 (1988) (en banc) (punitive damages generally inappropriate unless the railroad "had significant notice of a particularly dangerous condition and unjustifiably failed to rectify that condition"); *Anderson v. Chesapeake & Ohio Ry. Co.*, 147 Ill.App.3d 960, 101 Ill.Dec. 262, 498 N.E.2d 586, 591–92 (1986) (no "conscious disregard" even though the railroad knew of several prior accidents at the crossing and plaintiff's expert testified that the crossing was extra hazardous); *Friesen v. Chicago Rock Island & Pac. R.R.*, 215 Kan. 316, 524 P.2d 1141, 1146–48 (1974) (evidence that railroad knew of previous accidents at crossing, but failed to install lights and crossarms, or issue slow orders

was insufficient to show that defendant acted in wanton manner).

## IV. Plaintiff's Motion For New Trial

As explained above, plaintiff's motion for new trial is untimely and the Court therefore overrules the motion on that basis. Even if the Court were to consider the untimely motion, it would nevertheless rule against plaintiff. Plaintiff contends that she did not receive a fair trial because (1) the Court refused to strike juror Rocha for cause, (2) the Court did not require defendants to "stipulate" to liability, (3) the Court did not instruct the jury that defendants were liable for plaintiff's injuries and that they had "admitted" their liability; and (4) the Court did not strike defense counsel's comment during closing statement that "a flash flood washed out our bridge."

The decision to grant a motion for new trial is committed to the trial court's sound discretion. See *Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1194 (10th Cir.1997). In considering a motion for new trial, the Court must view the evidence in the light most favorable to the prevailing party. See *Joyce v. Davis*, 539 F.2d 1262 (10th Cir.1976). "[T]he party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence." *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983). The Court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (quotations and citations omitted).

### A. Juror Celia Rocha

The Court must grant a challenge for cause if a prospective juror shows actual prejudice or bias. See *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1467 (10th Cir.1994). "Actual bias can be shown either by the juror's own admission of bias or 'by proof of specific facts which show the juror has such a close connection to the facts at trial that bias is presumed.'" *Getter v. Wal–Mart Stores, Inc.*, 66 F.3d 1119, 1122 (10th Cir.1995) (quoting Vasey, 29 F.3d at 1468), cert. denied, 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996). "[C]ourts have presumed bias in extraordinary situations where a prospective juror has had a direct financial interest in the trial's outcome." *Getter*, 66 F.3d at 1122 (quoting *Vasey*, 29 F.3d at 1468). The doctrine of implied or presumed bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his or her deliberations under the circumstances. *Fitzgerald v. Greene*, 150 F.3d 357, 365 (4th Cir.1998); see *Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir.1996) (implied bias doctrine should not be invoked lightly; doctrine reserved for "extreme" and "exceptional" circumstances), cert. denied, 520 U.S. 1159, 117 S.Ct. 1342, 137 L.Ed.2d 501 (1997). Examples of such extraordinary situations include cases in which a prospective juror is a stockholder in or an employee of a corporation that is a party to the suit. *Getter*, 66 F.3d at 1122 (citations omitted). "In these situations, the relationship between the prospective juror and a party to the lawsuit 'point[s] so sharply to bias in [the] particular juror' that even the juror's own assertions of impartiality must be discounted in ruling on a challenge for cause." *Id.* (citations omitted).

During voir dire, plaintiff challenged juror Rocha for cause. Rocha's husband worked for BNSF for approximately 30 years before he retired in1982. See Transcript Of Pre–Jury Colloquy And Voir Dire Examination (Doc. # 160) filed July 7, 2000 at 22. He still receives a pension from BNSF and a free pass to travel on Amtrak. Rocha's son currently works for BNSF and has been employed by the company since approximately 1980. Rocha stated that she did not think that the

outcome of the case would have any effect on her husband's pension or her son's job. See id. at 22–23. She also stated that even if she was part of a jury that returned a big award in favor of plaintiff, that the fact would not bother her husband or son and that it would not be a problem in any way. See id. at 23. After counsel for plaintiff reminded Rocha that BNSF had essentially paid for part or all of her living for many years, Rocha stated that she did not believe it would be difficult to remain fair to both sides and then immediately thereafter stated that she did not know. See id. at 59. On further inquiry by the Court, Rocha stated that although she could not be sure, she did not believe the verdict would have any impact on her husband's pension or her son's job and that she was sure that she could be fair to both sides. See id. at 69 ("I don't think I owe them anything. My husband worked there for what he is getting now and what we are getting, he put in all his years of work there. But when he [counsel for plaintiff] asked me the questions, I thought—but I don't think my—I know for sure my son isn't going to lose his job on account of I am here, you know."). Based on the credibility and demeanor of Rocha, and her assurances of fairness, the Court overruled plaintiff's request to strike her for cause.

■■■ Rocha clearly did not admit to any bias or prejudice. Indeed she stated with conviction that she did not think that the verdict would impact her husband's pension or her son's job and that she was sure she could be fair to both sides. The closer question is whether bias should be implied based on the relationship between her husband and BNSF, and the employer-employee relationship between her son and BNSF. As explained above, bias is implied only in rare cases such as when the juror has a direct financial relationship with one of the parties. Although this case presents a close question,[8] the Court finds that Rocha did not have a sufficiently direct financial relationship with BNSF for bias to be implied. Plaintiff points to Getter, supra, in which the Tenth Circuit held that the district court erred when it refused to strike a prospective juror when the juror's wife was an employee of defendant and the juror owned stock in the defendant corporation. See id. at 1122. Here, Rocha's husband is retired and neither she nor her husband own stock in BNSF. Although he receives a pension from the company, the average person in Rocha's situation likely would remain impartial in his or her deliberations. See *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1260 (10th Cir.1999) ("issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced") (quoting *United States v. Torres*, 128 F.3d 38, 45 (2d Cir.1997), *cert. denied*, 523 U.S. 1065, 118 S.Ct. 1399, 140 L.Ed.2d 657 (1998)). In sum, the Court correctly found no actual bias or prejudice, either express or implied.

**B. Stipulation Of Liability**

■■■ At trial, defendants did not contest liability for plaintiff's injuries and the Court instructed the jury that based on defendants' position, the only issue for the jury was the amount of damages. Plaintiff argues that the Court erred because it refused to require defendants to "admit" liability in front of the jury. Plaintiff maintains that defendants promised to do so in the pretrial order and at the status conference. Contrary to plaintiff's representation, the pretrial order does not promise that defendants will "admit" liability. See Pretrial Order (Doc. # 84) filed March 6, 2000 at 22. At the status conference on May 30, 2000, defense counsel announced that defendants would "stipu-

---

8. In retrospect, the Court believes that it properly could have stricken Rocha for cause—and perhaps, in an abundance of caution, it should have done so. Despite Rocha's "indirect" financial relationship to defendants, however, the Court remains convinced that she was honest, fair and impartial in her deliberations. Accordingly, plaintiff received a fair trial. Moreover, by plaintiff's use of peremptory challenges, she had an opportunity to correct any alleged error.

late" to liability after they received the order on punitive damages, assuming that they could work out the precise language of the stipulation with plaintiff. Plaintiff and defendants never agreed to a stipulation. Absent a specific promise by BNSF to "admit" liability, the Court did not err by refusing to require defendants to do so in front of the jury.

 Plaintiff also claims that the Court erred because it refused to instruct the jury that "defendants admit they are at fault for plaintiff's injury." The decision whether to give a particular jury instruction is within the sound discretion of the Court. The instructions as a whole must provide correct statements of the governing law and provide the jury with an ample understanding of the issues and applicable legal standards. *Allen v. Minnstar, Inc.*, 97 F.3d 1365, 1368 (10th Cir. 1996). The question is not "whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues." *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1454 (10th Cir. 1997) (quotations and citations omitted); *see Brown v. Wal–Mart Stores, Inc.*, 11 F.3d 1559, 1564 (10th Cir.1993) ("An error in jury instructions will mandate reversal of a [civil] judgment only if the error is determined to have been prejudicial after reviewing the record as a whole.").

 In argument, counsel for plaintiff repeatedly reminded the jury that defendants had finally "admitted" their liability, shortly before trial, see Transcript Of Plaintiff's Opening Statement (Doc. # 159) filed July 7, 2000 at 4; Transcript Of Closing Arguments (Doc. # 161) filed July 7, 2000 at 3, 11, 18, 34. Defense counsel did not object to plaintiff's comments or attempt to explain to the jury the fine distinction between an admission of liability, a stipulation of liability and a failure to contest liability. Indeed, the difference between admitting, stipulating and not contesting liability was immaterial. The Court instructed that because defendants

did not contest liability, the jury would decide only the amount of damages which plaintiff had sustained as a result of the train derailment. See Instructions To The Jury (Doc. # 142) filed June 12, 2000, No. 11. Given the limited issue before the jury, the Court did not err by refusing to instruct the jury that defendants "admitted" liability.

## C. Causation Comment During Closing Argument

In closing argument, defense counsel stated that "[w]e are sorry that on August 9, 1997, a flash flood took out our bridge and we are sorry that our crew could not get our train stopped." Id. at 19. Plaintiff claims that the Court should have struck the comment as an improper attempt to suggest an alternative cause of her injuries. Plaintiff ignores the fact that the Court instructed the jury to only consider the issue of plaintiff's damages "caused by the train derailment," Instruction Nos. 11, 12. Any comment on the initial cause(s) of the train derailment was immaterial to the jury's deliberations. In context with the statements of plaintiff's counsel and the jury instructions, defense counsel merely clarified for the jury that although defendants did not contest their legal responsibility for plaintiff's injuries, they did not admit that they intentionally caused the train derailment. Plaintiff's objection to the statement of defense counsel is therefore overruled.

**IT IS THEREFORE ORDERED** that plaintiff's Motion For New Trial (Doc. # 155) filed June 28, 2000 be and hereby is **OVERRULED**

**IT IS FURTHER ORDERED** that plaintiff's Motion To Alter Or Amend (Doc. # 157) filed June 28, 2000 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that plaintiff's Motion For Extension Of Time

For Appeal (Doc. # 166) filed August 9, 2000 be and hereby is **OVERRULED**.