**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J. Fisher, Jr.                                    Elisabeth A. Shumaker
Clerk                                                        Chief Deputy Clerk

June 5, 2000

**TO:** ALL RECIPIENTS OF THE OPINION

**RE:** 98-2265, *Weitz v. Lovelace Health System Inc.*
Filed on May 31, 2000

The slip opinion, filed on May 31, 2000, contains a typographical error on page three, in the first sentence of section "I. BACKGROUND." The date, "January 21, 1991" is corrected to read "January 21, 1992." Please make the correction to your copy of the opinion.

Sincerely,

Patrick Fisher, Clerk of Court

By:    Keith Nelson
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 31 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

LORRAINE L. WEITZ, Personal
Representative of the Estate of Arlene
Gutierrez, Deceased, and Personal
Representative of the Estate of Loretta
Gutierrez, Deceased,

     Plaintiff-Appellant,

v.

LOVELACE HEALTH SYSTEM,
INC., doing business as Lovelace
Medical Center; LOVELACE
MENTAL HEALTH PARTNERSHIP;
TIM STROGIN, PH.D.; GENEVIEVE
DAVIDGE, LCSW; J. BARRY
RUMBLES, LCSW,

     Defendants-Appellees.

  and

CIGNA CORPORATION; CIGNA
HOLDINGS, INC.; CIGNA HEALTH
CORPORATION; CIGNA
HEALTHCARE INC.;
CONNECTICUT GENERAL
CORPORATION; UNITED STATES
OF AMERICA,

     Defendants.

No. 98-2265

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV 94-1286 MV)**

Richard D. Barish, Albuquerque, New Mexico, for Plaintiff-Appellant.

Gary L. Gordon, Albuquerque, New Mexico (Robin A. Goble, with him on the briefs), for Defendants-Appellees.

Before **EBEL, HOLLOWAY,** and **KELLY**, Circuit Judges.

**EBEL**, Circuit Judge.

Plaintiff-Appellant Lorraine Weitz ("Weitz") filed an action on behalf of her sister, Arlene Gutierrez ("Arlene"), and her niece, Loretta Gutierrez ("Loretta") in federal district court against the United States, Lovelace Health and several of its employees and business affiliates (collectively, "Lovelace") (a mental health provider), and various other defendants.[1]  Weitz filed suit against the United States pursuant to 28 U.S.C. § 1346(b), the Federal Tort Claims Act, alleging negligence.  Weitz also brought claims of negligence against Lovelace pursuant to New Mexico state law.  The district court had pendent jurisdiction over the New Mexico state law claims pursuant to 28 U.S.C. § 1367.  The district court dismissed the United States as a party pursuant to Federal Rule of Civil

---

[1] These other defendants were voluntarily dismissed at the summary judgment hearing and are not parties on appeal.

Procedure 12(b) and granted summary judgment for Lovelace on the New Mexico state law claims.

Weitz appealed the order of the district court. This court dismissed the United States from this appeal by order entered March 4, 1999. Thus, Lovelace is the only appellee and the New Mexico state law claims are the only claims remaining in this case. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

On January 21, 1992, Edward Gutierrez ("Eddie"), husband of Arlene Gutierrez and father of Loretta, shot Arlene and Loretta and then took his own life. Eddie was an Air Force Staff Sergeant stationed at Kirtland Air Force Base in Albuquerque, New Mexico. Lovelace provided mental health care services to Air Force personnel and their families at Kirtland.

Eddie and Arlene began having marital problems in the early 1990s. They attended counseling sessions in connection with these problems in December 1991. They were seen jointly on December 4 by J. Barry Rumbles, a psychotherapist employed by Lovelace who referred them to a therapist for counseling. Eddie and Arlene were then seen jointly on December 9 by Dr. Cal Bolinder. Bolinder was apparently employed by Adlerian Therapy Services, not Lovelace. Bolinder saw Eddie individually on December 12 and Arlene

individually on December 11 and 20. Bolinder also had telephone conversations with Arlene on a number of occasions. Arlene expressed concern about Eddie's violent tendencies during these conversations. Bolinder told Arlene at the December 20 session and on the phone on December 30 that she should try to keep herself and Loretta away from Eddie.

Eddie asked Arlene to come to his home on December 29 to discuss their marriage and Arlene agreed to go. When Arlene arrived with Loretta, Eddie was drunk. Arlene and Eddie discussed divorce, and Eddie said that he would disown Loretta so that he would not have to pay child support. After Arlene told Eddie she was leaving, Eddie pulled out a handgun. Arlene managed to wrestle the gun away from Eddie. Eddie at that time threatened suicide. Arlene reported the incident the following day to Col. Richard Haupt, Eddie's commanding officer. Haupt made an appointment for Eddie to be evaluated by the mental health clinic. When Eddie told Haupt that he felt an examination was unnecessary, Haupt ordered Eddie to go to the clinic.

Although Eddie had an appointment to see Capt. Sally Kroner, a psychiatrist and Air Force officer, he arrived late for his appointment and could not be seen by Kroner because she had another appointment. Eddie was instead seen by Genevieve Davidge, a licensed clinical social worker employed by Lovelace. Davidge observed that Eddie was anxious and that he was unsure of

his ability to handle his emotions should he and Arlene divorce. Davidge concluded that Eddie was not an immediate threat to himself or others but scheduled an appointment for Eddie to return the following day for further examination. Haupt ordered Eddie to go to the December 31 appointment. After meeting with Eddie a second time, Davidge concluded that Eddie was improved. Davidge recommended continued outside counseling, but none was arranged and Eddie never received additional counseling.

During the December 30 meeting between Haupt and Eddie, Haupt asked Eddie if he would be willing to turn over his weapons to Sgt. Keith Yekel. Eddie gave his weapons to Yekel on December 31. Two weeks later, Yekel returned the guns to Eddie after Eddie asked for the guns back so that he could go "plinking," i.e., shooting cans. On January 21, Arlene went to Eddie's home to pick up Loretta, whom he had been babysitting. Eddie shot and killed Arlene and Loretta and then took his own life.

Weitz filed this action against the United States, CIGNA (the parent company of Lovelace), Lovelace, and other individuals. As indicated above, CIGNA was voluntarily dismissed as a party at trial and this court dismissed the United States by an order entered on March 4, 1999, pursuant to a stipulation by the parties. Weitz's remaining claims alleged that Lovelace had acted negligently by: (1) failing to adopt adequate policies for the evaluation of airmen who had

threatened suicide or murder; (2) failing to warn the United States that it had inadequate policies in this regard; (3) failing to provide an adequate system for evaluating troubled airmen who threatened suicide or murder; (4) failing to properly train their personnel; (5) failing to provide competent personnel to perform evaluations; (6) failing to adopt adequate policies to supervise personnel; and (7) failing to adequately supervise personnel. The district court granted Lovelace's motion for summary judgment, holding that: (1) Lovelace had no duty to control Eddie (i.e., prevent Eddie from harming another) because he was merely an outpatient; and (2) Lovelace had no duty to warn Arlene or Loretta because Arlene and Loretta were fully aware of Eddie's violent propensities.

## II. Discussion

A. Timeliness

We must first address whether we have jurisdiction to review the district court's summary judgment order, or whether our review is confined to the district court's denial of Appellant's subsequent motion for reconsideration. Because we find that Appellant did not timely file her notice of appeal with respect to the court's summary judgment order, we may only consider whether the district court abused its discretion in denying her motion for reconsideration.

On May 27, 1997, the district court entered its order granting summary judgment and dismissing Weitz's claims with prejudice. On June 10, 1997,[2] Weitz filed a Motion for Extension of Time to File Motions Pursuant to Fed. R. Civ. P. 59(e) to Reconsider Judgment Entered May 27, 1997 Dismissing Plaintiff's Claims. That motion requested an extension of time until June 20, 1997. On June 13, 1997, the court entered an order granting this motion and extending Weitz's time until June 20, 1997, to file a Rule 59(e) motion. On June 20, 1997, Weitz filed a Rule 59(e) Motion to Reconsider Order Granting Lovelace Defendant's Motion for Summary Judgment or, in the Alternative, to Certify the Question of Duty to the Supreme Court of New Mexico. On July 31, 1998, the district court denied Weitz's motion. Weitz then filed her notice of appeal on September 28, 1998.

Generally, a party has thirty days from the entry of the district court's order or judgment within which to file a notice of appeal. See Fed. R. App. P. 4(a)(1)(A). When the United States or its officer or agency is a party to the case, the time is extended to sixty days. See Fed. R. App. P. 4(a)(1)(B). The appeal period is tolled, however, when a party timely files either a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e) (filed no later than ten days after

---

[2] Excluding intervening weekends, any motion to alter or amend under Fed. R. Civ. P. 59(e) was due by June 10, 1997.

entry of judgment), or a motion for relief under Fed. R. Civ. P. 60 (provided that the Rule 60 motion is filed within ten days of entry of the judgment). See Fed. R. App. P. 4(a)(4)(A)(iv), (vi). In the case at bar, it is undisputed that Appellant did not file a notice of appeal until more than a year after the district court entered summary judgment in favor of Appellee. The question before us, therefore, is whether Appellant's post-judgment motion, filed on June 20, 1997, successfully tolled the period for filing a notice of appeal.

We must first examine whether it is proper to view Appellant's post-judgment motion as a Rule 59 motion. Generally, this court will construe a motion to alter or amend or to reconsider the judgment that is served more than ten days after the judgment is entered as a motion for relief under Rule 60(b). See Van Skiver v. United States, 952 F.2d 1241, 1243 (10th Cir. 1992). Appellant filed her Rule 59(e) Motion to Reconsider on June 20, 1997, which was more than ten days after the district court entered its order granting summary judgment. Under most circumstances, we would therefore treat this as a Rule 60(b) motion filed more than ten days after the judgment was entered, which thus failed to toll the time period for filing a notice of appeal from the summary judgment order.

In rare cases, however, these time limits can be extended where the party makes a showing of "unique circumstances" justifying the delay. See Thompson

v. INS, 375 U.S. 384 (1964) (announcing the "unique circumstances" exception).
Appellant contends that because she filed a motion for additional time to file a
59(e) motion within ten days of entry of summary judgment and because the
district court granted that motion, this case presents such unique circumstances.
We disagree.

It is clear that the district court was not empowered to grant Appellant
additional time to file her 59(e) motion. Rule 59(e) specifies that "[a]ny motion
to alter or amend a judgment shall be filed no later than 10 days after entry of the
judgment." Fed. R. Civ. P. 59(e). Rule 6(b) grants the district court limited
authority to extend various time limits under the rules. That rule provides,
however, that the court "may not extend the time for taking any action under
Rule[] . . . 59(b), (d) and (e), . . . except to the extent and under the conditions
stated [therein]." Id.; see also Collard v. United States, 10 F.3d 718, 719 (10th
Cir. 1993) ("Rule 6(b) expressly prohibits a trial court from extending the time to
file [a Rule 59(e)] motion."). Rule 59 provides no exceptions to the ten-day rule.
Thus, the district court lacked authority to grant Appellant's motion for additional
time to file her Rule 59(e) motion.

In Stauber v. Kieser, 810 F.2d 1 (10th Cir. 1982), this court held that a
district court's unauthorized grant of additional time to file a Rule 59(e) motion
would constitute unique circumstances. There, the motion was filed more than

ten days after the judgment, but within the thirty-day time period for an appeal, and we said that the appellant had relied to his prejudice on the order granting the extension of time to file a Rule 59(e) motion by not otherwise filing an appeal within the required thirty days. However, several years later the Supreme Court in Osterneck v. Ernst & Whinney, 489 U.S. 169 (1989), adopted a narrow interpretation of the unique circumstances test. The Osterneck Court declared that "Thompson [(the Court's decision announcing the unique circumstances test)] applies only where a party has performed an act which, if properly done, would postpone the deadline for filing his appeal and has received specific assurance by a judicial officer that this act has been properly done." Id. at 179. Osterneck thus casts significant doubt on the continuing validity of our decision in Stauber.

One of our post-Osterneck decisions suggests that Stauber is no longer good law. In Certain Underwriters at Lloyds of London v. Evans, 896 F.2d 1255 (10th Cir. 1990), we held that a district court's decision to grant a thirty-day extension for filing a notice of appeal (under circumstances where the rules authorize only a ten-day extension) did not rise to the level of unique circumstances. See id. at 1257-58. In that case, a party requested an extension of time in which to file a notice of appeal after the initial thirty-day period for doing so had expired. Federal Rule of Appellate Procedure 4(a)(5) authorized a ten-day extension upon a showing of excusable neglect or good cause, but the court

- 10 -

granted an additional thirty days in which to file. See id. at 1256-57. We dismissed the appeal for lack of jurisdiction, finding that the district court's erroneous ruling did not present unique circumstances. See id. at 1258. We held there, inter alia, that "an appellant has a duty to familiarize himself with the appellate rules," and therefore the party's "reliance on the extension was [not] reasonable." Id. By asking the court for an extension that the rules expressly prohibit, the party invited the ensuing error. Id. Thus, Certain Underwriters holds that a case does not present unique circumstances where a plain reading of the rules would have allowed the party to avoid the error.

In the present case, Appellant's counsel could have avoided this mistake by reading Rules 59(e) and 6(b) prior to filing the motion for an extension of time. In light of the clear prohibition of the extension, we cannot say that Appellant's reliance on the court's order was reasonable. In this regard, the present case is similar to Certain Underwriters, where we held that even a manifestly erroneous ruling by the district court did not constitute a specific assurance by the court that the request was properly made. See also Van Skiver, 952 F.2d at 1243 n.3 (noting that a district court's consideration on the merits of an untimely Rule 59(e) motion does not present unique circumstances in the absence of affirmative assurances by the court that the motion was timely); Wollan v. United States Dep't of the Interior, No. 98-1219, 1999 WL 398744 at *2 (10th Cir. June 16,

1999) (unpublished disposition) (holding that granting a motion for extension of time is not the "specific assurance" required by <u>Osterneck</u>, and stating that "under Rule 6(b), the district court had no authority to extend the time for filing a Rule 59(e) motion, and plaintiff's reliance on the extension of time [to toll the period for filing a notice of appeal] was unreasonable"); <u>cf.</u> <u>Fox v. Noram Energy Corp.</u>, No. 98-6141, 1999 WL 961226 at *3 (10th Cir. Oct. 21, 1999) (unpublished disposition) (holding that a district court's acceptance of an untimely resubmitted Rule 59(e) motion after appellant had remedied a defect in its timely motion did not constitute unique circumstances).

Moreover, <u>Osterneck</u> limited the application of the unique circumstances rule to instances "where a party has performed an act which, if properly done, would postpone the deadline for filing his appeal." 489 U.S. at 179. In the case at bar, the rules expressly forbid granting an extension for a Rule 59(e) motion, so by definition the motion to extend could never be "properly done." Unlike a situation where some extension of time was permissible, here the rules specifically and directly prohibit courts from granting any extensions for Rule 59(e) motions. Thus, the present case does not fit within the confines of <u>Osterneck</u> because no such extension would ever be proper under the rules. In the present case, the rules expressly forbid any extensions for Rule 59(e) motions, and even a passing reference to the rules will reveal this fact.

Consequently, the mere fact that a court has granted such an extension does not justify reliance that is clearly at odds with the text of the rules.

It makes great practical sense to require the parties to comply with clearly mandated requirements in the Federal Rules. Otherwise, we would be encouraging litigants to invite courts to commit easily avoidable errors. District courts today suffer under a burdensome caseload, and a certain degree of cooperation and assistance from litigants is essential to the judicial system's effective operation. Just as we require attorneys to certify that all arguments presented to the court have legal and factual bases, see Fed. R. Civ. P. 11(b), we likewise impose upon attorneys the duty to make sure that their requests are not expressly forbidden under the rules.

"In the case of an intervening Supreme Court ruling, a single panel is permitted to reconsider a previous Tenth Circuit decision to the extent the new case law invalidates our previous analysis." Hurd v. Pittsburg State Univ., 109 F.3d 1540, 1542 (10th Cir. 1997). Osterneck and subsequent decisions by this court make clear that an extension of time granted by the court but clearly prohibited entirely by the Federal Rules does not constitute unique circumstances salvaging an untimely notice of appeal. Thus, we expressly overrule Stauber to the extent it is inconsistent with Osterneck and Certain Underwriters. See Lichtenberg v. Besicorp Group Inc., 204 F.3d 397, 404 (2d Cir. 2000) ("And

though a timely motion under Civil Rule 59(e) would have postponed the appeal deadline, any request by [the party] for an extension of the time to move under that Rule would have been a request that, given the prohibition in Civil Rule 6(b), could not properly be made."); Pinion v. Dow Chemical, 928 F.2d 1522, 1532 (11th Cir. 1991) (rejecting a notice of appeal as untimely even though the district court had granted an extension of time to file a 59(e) motion just two days after entry of judgment and noting that "the crucial jurisdictional question becomes: Was it *reasonable* for [appellant] to rely upon the district court's improper extension of the time for filing post-trial motions, in spite of the explicit language of Rule 6(b) prohibiting the district court from granting such an extension? . . . [W]e must answer 'No'"). The failure of Appellant's counsel to determine whether it was within the authority of the district court to grant additional time negates Appellant's claim that this case presents unique circumstances.

Consequently, Appellant is not entitled to the tolling provision of Rule 59(e), and thus her ultimate notice of appeal with regard to the district court's summary judgment order was untimely. We therefore lack jurisdiction over that claim. As a result, our review is limited to whether the district court properly denied Appellant's motion to reconsider, which we construe as a Rule 60(b) motion because it was filed more than ten days after judgment was entered.

B. Standard of Review

"We review . . . the disposition of Rule 60(b) motions for an abuse of discretion. . . . Under this standard, we will not reverse unless the trial court has made 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 992 (10th Cir. 1999) (quoting FDIC v. Oldenburg, 34 F.3d 1529, 1555 (10th Cir. 1994)) (citations omitted).

C. Merits

Under New Mexico law, Lovelace cannot be held liable for the deaths of Arlene and Loretta unless Appellant can show that Lovelace owed a duty of care to Arlene and Loretta Gutierrez.  See Calkins v. Cox Estates, 792 P.2d 36, 39 (N.M. 1990).  In Wilschinsky v. Medina, 775 P.2d 713 (N.M. 1989), the New Mexico Supreme Court stated that a health care provider may owe a duty of care to third parties under three circumstances.  First, a doctor may be held liable when he exerts control over a patient (duty to control).  See id. at 715.  Second, the Wilschinsky court noted, under the line of cases stemming from Tarasoff v. Regents of University of California, 551 P.2d 334 (Cal. 1976), a doctor may be held liable if he fails to warn or disclose his patient's threats against a specific, identifiable third party to the authorities or the individual (duty to warn).  See Wilschinsky, 775 P.2d at 715-16.  Finally, the court held that a doctor owes a duty of care to third parties if he has given an outpatient an injection of drugs that

- 15 -

could clearly impair the patient's ability to reason and operate a motor vehicle.

Id. at 716.  It is clear that this third situation has no relevance to the case at bar.

### 1. Duty to Control

Weitz argues the district court erred when it concluded that Lovelace had no duty to protect Arlene and Loretta from Eddie's violent propensities.  The New Mexico Supreme Court has explained:

> In the control cases, courts have relied upon Section 315 of the Restatement (Second) of Torts to find a special relationship between doctor and patient, which creates a special duty to control that patient's actions. Restatement (Second) of Torts § 315 (1965).  This doctrine, holding institutions and doctors potentially liable for patients with known "dangerous propensities" has been recognized in New Mexico.  See Kelly v. Board of Trustees, 87 N.M. 112, 529 P.2d 1233 (Ct. App.), cert. denied, 87 N.M. 111, 529 P.2d 1232 (1974); see also Stake v. Woman's Div. of Christian Serv., 73 N.M. 303, 387 P.2d 871 (1963).

Wilschinsky, 775 P.2d at 715.

At present, New Mexico law states that the duty to control "must stem from the doctor's control over his offices . . ., not from a duty to control a patient with known dangerous propensities."  Wilschinsky, 775 P.2d at 715.  New Mexico apparently has not established whether a health care provider can owe a duty to third parties arising from control where the individual is being treated on an outpatient basis.[3]  The strong weight of authority suggests that New Mexico

---

[3] Following Wilschinsky, we treat separately situations where a patient
(continued...)

- 16 -

would not find such a duty exists under these circumstances.  As the court below

aptly noted, at least five states considering the matter have declined to find a duty

under similar circumstances.  See Boulanger v. Pol, 900 P.2d 823, 834 (Kan.

1995); Fischer v. Metcalf, 543 So. 2d 785, 787 n.1 (Fla. Dist. Ct. App. 1989);

Wagshall v. Wagshall, 538 N.Y.S.2d 597, 598 (N.Y. App. Div. 1989); King v.

Smith, 539 So.2d 262, 264 (Ala. 1989); Hinkelman v. Borgess Med. Ctr., 403

N.W.2d 547, 551 (Mich. Ct. App. 1987).  But see Estates of Morgan v. Fairfield

Family Counseling Ctr., 673 N.E.2d 1311 (Ohio 1997).  In most instances, the

relationship a psychiatric outpatient has with the health care provider is less

involved than that of an inpatient.  In the latter circumstance, the medical

professional is typically both responsible for and able to administer almost all

aspects of the patient's well-being.  By contrast, the outpatient relationship

usually requires that the treated individual care for most of his or her daily needs,

and affords the health care provider only limited opportunity to supervise the

patient.  As a result, imposing a duty to control in the outpatient context would

require providers to exercise a degree of care and oversight that would be

practically unworkable.

---

³(...continued)
receives an injection of powerful medications on an outpatient basis.

The facts of the present case indicate that New Mexico most likely would not impose such a duty on Lovelace. Lovelace treated Eddie on an outpatient basis, and it did so on only three occasions. In addition, some three weeks had elapsed between Eddie's last encounter with Lovelace and the murders of his wife and daughter. Relative to a situation where a patient is in the custodial or long-term care of a health care provider, Eddie's contact with Lovelace was minimal in both duration and degree. Thus, it would be unreasonable to conclude that Lovelace had the sort of substantial relationship with Eddie giving rise to a duty, much less the practical ability, to control him.

**2. Duty to Warn**

Appellants further suggest that Lovelace owed a duty to warn Arlene and Loretta of Eddie's violent propensities. New Mexico has noted that many courts recognize "a duty to warn when a specific, identifiable third party [victim] was known to the doctor," Wilschinsky, 775 P.2d at 716, although it does not appear that the state has resolved this question for itself. It is unnecessary to decide the applicability of Tarasoff in New Mexico, however, because it is probable that New Mexico would not impose such a duty in any event where the victim was already subjectively aware of the patient's violent tendencies and specific threats.

Other jurisdictions considering the matter have held that a victim's awareness of the potential harm negates the health care provider's duty to warn.

- 18 -

See, e.g., Boulanger, 900 P.2d at 835 ("The duty to warn does not arise when the victim already knows of the danger."); Leonard v. Latrobe Area Hosp., 625 A.2d 1228, 1231 (Pa. Super. Ct. 1993) ("It is a curious lapse in logic on plaintiffs' part to claim that [the doctor] should have warned them of information they already had, and with which they were familiar."). In the products liability context, New Mexico has evidenced its agreement with the common-sense proposition that a duty to warn does not arise where the danger is known. See Perfetti v. McGhan Med., 662 P.2d 646, 651 (N.M. Ct. App. 1983) ("In this case there would be no duty to warn the [victim] if he actually knew of the danger."). The case law thus supports the proposition that a potential victim's awareness of the specific threats and violent tendencies of an outpatient obviates the health care provider's duty to warn that potential victim.

In the present case it is clear that Arlene was aware of both Eddie's threats against her and his propensity for violence. Records from a counseling session Arlene attended December 20 indicate that she was aware of Eddie's violent tendencies and the possibility that he might harm her and her daughter. At that session, Arlene agreed with the therapist to avoid situations where Eddie might "be in a position to do harm to either one of them." Following the December 29th incident in which Eddie pointed a gun at Arlene, Arlene told her sister that she

was afraid he would kill her.  The therapist's records confirm Arlene's awareness

of the threat:

> A major turning point happened when Eddie threatened Arlene and
> her daughter with a gun. . . . Once she got out of the house she knew
> that it was not safe to be around Eddie, ever again.  She knew she
> could not trust him. . . . The threat of death directed towards Arlene
> and her daughter convinced me that things had definitely gotten out
> of hand. . . . After some discussion I told Arlene the following: She
> <u>must</u> keep both herself and her daughter away from Eddie no matter
> how skillful he is at attempting to get them alone with him.

Thus, there can be no doubt that Arlene was fully aware of Eddie's potential for

violence against her and her daughter.[4]  As a result, we believe New Mexico

would conclude on these facts that Lovelace did not have a duty to warn Arlene

and her daughter.

Under the deferential standard of review to be applied to rulings on a Rule

60(b) motion, we cannot find that the district court committed error.

---

[4] Lovelace alleged that Arlene's awareness of Eddie's threats relieved
Lovelace of any duty to warn Arlene or Loretta.  Appellant has not argued to this
court that Arlene's awareness is insufficient to impute the same state of mind to
her daughter.  Thus, although it is unclear how New Mexico would resolve this
issue, <u>see</u> <u>Rider v. Albuquerque Pub. Sch.</u>, 923 P.2d 604 (N.M. Ct. App. 1996),
Appellant has waived any argument that Arlene's knowledge does not impute to
Loretta, <u>see</u> <u>FDIC v. Noel</u>, 177 F.3d 911, 917 n.4 (10th Cir. 1999).  Even were
Arlene's knowledge somehow ineffective in giving notice to Loretta, we do not
believe that New Mexico would find a duty to warn existed under these facts.

**CONCLUSION**

For the foregoing reasons, we hold that the Appellant's post-judgment motion should be treated as one under Rule 60(b), and that the district court did not abuse its discretion in denying the motion. Under these facts, Lovelace had neither a duty to control Eddie nor a duty to warn Arlene or Loretta, and therefore Lovelace cannot be held responsible for Eddie's conduct. Accordingly, the judgment of the district court is AFFIRMED.